UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>EBRAHIM SHABUDIN and<br>THOMAS YU,<br><br>    Defendants. | Case No. 11-cr-00664-JSW-1 (NJV)<br><br>**ORDER RE DEFENDANTS' MOTION TO COMPEL** |

The parties and the court have resolved a number of discovery matters in this case. *See* Doc. Nos. 125, 138, 142, 148, 150. At this juncture, the remaining discovery dispute concerns the DOJ Relativity Database (the "Database") that the parties are using to review documents produced by the Government.

The Government created the Database because it was in its interest to do so, as it needed to manage the vast quantities of documents being produced in this action. *See* Doc. No. 52.[1] The parties negotiated and agreed to "Terms and Conditions for Access" to the Database, which included the use of project managers who would provide technical as well as substantive support to the participants. *See* Doc. No. 166 at 2 & 166-1 at 2-3 ("Relativity Support Function"). Defendants argue that the project managers are essential to their ability to use the Database. *See* Doc. No. 166 at 2-3; *see also* Doc. No. 173 at 12-13. The Government undertook to provide Database project managers "for the length of the matter." Doc. No. 52 at 5; *but see* Doc. No. 169 at 12 n.1 (the Government argues that based on the location of this term in the Joint Status Report,

---

[1] The Database was originally intended to "serve three separate actions with potentially three separate trial or hearing dates." Doc. No. 169 at 3.

"matter" should be understood to mean "the [D]atabase project" rather than the criminal action). The Government concedes that there was little discussion between the parties about the *duration* of the Database, but argues that it was contemplated that the Database had "a projected two year project duration" and a $1.8 million budget. *Id*. at 6. In excess of nine million documents were uploaded to the Database, and the parties stipulated that the Database was "completed" on January 11, 2013. *See* Doc. No. 65 at 1; Doc. No. 150 at 1 n.2. The parties started gaining access to the Database on February 1, 2014. *See* Doc. No. 171 (Declaration of Amy Dove) at ¶ 3.

Defendants at some point thereafter came to understand that the Government had not uploaded all documents produced in the action to the Database. *See* Doc. No. 125. They moved to compel the Government to upload the contents of three hard drives (14, 15, and 16) and 159 boxes of hard copy materials obtained from a third party (the "Pillsbury boxes"). *Id*. The Government had produced the hard drives directly to Defendants and had invited Defendants to review the Pillsbury boxes at their convenience, but declined to upload them to the Database; all together, these new materials amounted to almost one million pages. *See generally* Doc. No. 125. The Government argued that it never agreed to, nor contemplated, uploading these materials to the Database, and that the Defendants should have understood this, and would have if they had reviewed the indices the Government prepared in connection with its production. *See* Doc. No. 168. Defendants effectively explain why they should not have, and in fact did not, understand this to be the case. *See* Doc. No. 173.

Nonetheless, during a February 3, 2014 hearing on the motion to compel, the Government agreed to upload hard drives 14 and 15[2] and the Pillsbury boxes to the Database *voluntarily*, and asked that the court not order it to do so. *See* FTR Feb. 3, 2014 at 9:51 ("I am prepared to do this on a voluntary basis. I don't think that Rule 16 compels us to do so"), at 10:35 (Government: "What I propose is that the court permit the Government to *voluntarily* upload hard drives 14, 15, scan and then upload the Pillsbury documents into the DOJ Relativity Database, so long as it can be properly segregated so that only the criminal defendants can have access to it") (emphasis

---

[2] Hard drive 16 contained information that already had been uploaded to the Database.

1 added); *see also* Doc. No. 169 at 7:11-15, Doc. No. 170 at ¶ 3.  The Government expressed

2 concern about uploading the documents to the Database in a manner that would make the newly

3 uploaded documents accessible to non-parties:

> We have opposed putting the Pillsbury materials onto the version of the Database that is accessible to non-parties.  […]  [T]here may be a technical solution to this problem. . . . .  All along, from the beginning, DOJ has had an interest in getting this information which is so voluminous to the Defendants because it's in our interest to do so.  We've done that voluntarily and we've spent $1.8 million to create this database in order to do it.  If there's a technological fix that will solve the core problem of preventing non-parties from seeing the Pillsbury materials in the current posture, we are happy to explore it.  I've been led to believe there is such a possibility, that there is a lock or a password or a way to segregate this information, which will certainly give the defense the relief that they've asked for.

11 FTR Feb. 3, 2014 at 9:48-9:50; *see also* FTR Feb. 3, 2014 at 9:51-9:58, 10:35; *see also* Doc. No.

12 170 at ¶ 3.

13 On February 26, 2014, the Government *for the first time* announced that the "extra cost"

14 associated with this "voluntary" commitment would draw down on the $1.8 million budget that

15 had been allocated to Database, and "for this reason, we anticipate funding for the [] Database will

16 end on June 1, 2014."  Doc. No. 170, Ex. A at 1-2 ("To comply with the Court's request to scan

17 these materials as quickly as possible, we have pursued new – and more expensive – alternatives.

18 We have found another solution that will minimize the delay in the short run but reduce the time

19 the [] Database will be available in the long run"); *see also* Doc. No. 169 at 10 (conceding that is

20 the date when the Government first explained to Defendants or the court that adding the Pillsbury

21 boxes to the Database would require the Database to be wound down for budgetary reasons).  The

22 Government anticipated that the new materials would be uploaded to the Database by April 1,

23 2014, and that the parties thus would have two months to keep reviewing the millions of "old"

24 documents and the thousands of new documents uploaded to the Database.[3]  Once the Database

25 wound down, the materials would be transferred to a Concordance database that Defendants could

---

[3] The court notes that the Government filed a superseding indictment with expanded charges on March 11, 2014 (Doc. No. 157), and that trial in this action is expected to commence, at the earliest in December 2014.

3

maintain at their own cost.

Unsurprisingly, Defendants took issue with the Government's proposal.  *See* Doc. No. 150; *see also* Doc. No. 173.  At a March 13, 2014 discovery hearing on the matter, the court asked the Government to look into extending the duration of the Database past June 1, 2014, and also issued an order requiring the Government to obtain additional information regarding the proposed transition to a Concordance database after the Database was wound down.  *See* Doc. No. 160.  The Government then unilaterally decided to "discontinu[e] paying for 'non-technical support and paralegal services'" in order to extend the duration of the Database.  *See* Doc. No. 170, Ex. B; *see also* Doc. No. 169 at 8.  Defendants argue that the services the Government discontinued are vital to their ability to use the Database.  Doc. Nos. 166 & 173.

In responding to the court's questions regarding the proposed transfer to a Concordance database, the Government declared that the transfer itself would cost $118,000 and take six to eight weeks.  *See* Doc. No. 169 at 9.  Moreover, while "all document level fielded data that is currently viewable and searchable in [the Database, including] any user created document field data and user created data such as tags would be preserved[;]" "metadata that is created by [the Database] and record[s] user actions in [the Database] or is specific to [Database] functionality" will not be kept in the transfer.  *Id*. at 9-10.  Specifically, the metadata that would not be kept includes: (1) Database user actions ("audit history"); (2) user searches including save search syntax; (3) image annotations; and (4) Database "artifacts" such as batches, views, or layouts.  *See* Doc. No. 171 at ¶ 7; *see also* Doc. No. 173 at 13 (Defendants complained that "we would lose our saved searches compiled in files within the database, the very work that we have spent months and many hours putting together.  These files essentially represent the virtual entirety of the defense work on the data base. . . . we would lose the organizational structure of these files and data, including their fields and their coding. . . . the transfer . . . would eradicate defense work product on the database, thereby eviscerating months of effort to build a defense").  The Government admitted that no one at LTSC has attempted to switch e-discovery platforms in mid-project in the manner proposed by the Government.  Doc. No. 170 at ¶ 6.  The court notes that the Government makes no representations regarding why it believes such a transition nonetheless could be

4

accomplished smoothly. *See id.* The Government also represented that the monthly cost of operating the Database going forward with the level of service described in the Terms and Conditions of Access that the parties agreed to would be $66,132.87, while the monthly cost of operating with the bare bones version now proposed by the Government would be $27,947.71. Doc. No. 169 at 8-9; Doc. No. 171.

The court also asked the Government when it first explained to Defendants or the court that there was a possibility that the Database could be wound down before trial. Doc. No. 160. The Government could not point to a single instance where it actually informed Defendants that this was a possibility. *See* Doc. No. 169. Although the Database was not "completed" until January 2013, the Government contends that the "projected" two year project duration should be calculated based on June 14, 2012 – the date the Database project commenced. *See* Doc. No. 169 at 11. Thus, the Government argues, Defendants should have expected the Database to wind down on June 14, 2014 – three months after the Government filed its superseding indictment and six months before the beginning of trial. The Government also points out that Defendants understood that a $1.8 million budget had been allocated to the Database and appears to imply that Defendants should have expected that the allocated funds would be insufficient and that the Database would be shut down well in advance of trial. It is apparent from the record that, had the Government taken this position when it broached the possibility of using the Database to manage discovery in this case, Defendants would have objected strenuously. In fact, Defendants reasonably argue that they understood the "two year project duration" would start "not from initial conception" of the idea of the Database, but rather from completion of the Database, and that the "projection" was an educated estimate, not a predetermined, un-negotiable, deadline. Doc. No. 173 at 7. They further point out that the Government did not keep them apprised of ongoing expenditures or that the Database was near budget. *Id.* at 8, 11-12.

Whether Rule 16, *Brady*, or *Giglio* required the Government to upload hard drives 14 and 15 or the Pillsbury boxes to the Database is no longer the relevant inquiry. The Government *voluntarily* undertook to do so after Defendants filed their motion to compel. The Government did so without warning Defendants that their voluntary compliance would come at the steep price of

5

curtailing meaningful access to the Database mere weeks after the Government filed its superseding indictment, and of shutting down the Database six months before trial. A Pyrrhic victory for Defendants, indeed. Based on the record, the court finds the following:

(1) the Government chose to use an e-discovery platform for this action, selected and managed the e-discovery provider, and negotiated and agreed to Terms and Conditions for Access to the Database with the Defendants;

(2) Defendants relied upon their agreement with the Government and began using the Database extensively, saving their work product and searches in the Database as metadata;

(3) the Government never disclosed to Defendants that it planned to or could wind down the Database before trial;

(4) the Government voluntarily undertook to upload hard drives 14 and 15 and the Pillsbury boxes to the Database;

(5) the Government never disclosed that uploading these new materials to the Database would impact the Terms and Conditions for Access to the [] Database or the duration of the Database;

(6) the Government has not established that transferring the project to a Concordance database could be done effectively, nor that it could be achieved without prejudicing Defendants given that several categories of metadata generated throughout the year they used the Database would be lost;

(7) through their *ex parte* submissions to the court, Defendants have adequately established that there is no "$40 million defense budget" nor any other resources that they could use to fund the set up and access to a Concordance database (*see* Doc. Nos. 167 & 174-176);

(8) the Government has not established that Defendants would continue to have meaningful access to the Database if the project manager functions described in the Terms and Conditions for Access to the Database are eliminated;

(9) that unilaterally changing the Terms and Conditions for Access to the [] Database to

the detriment of Defendants at this point in the proceedings has prejudiced Defendants' ability to prepare for trial and offends the court's notion of fairness; and,

(10)   that winding down the Database before Defendants are ready for trial in December 2014 would prejudice Defendants' ability to prepare for trial and would offend the court's notion of fairness.

THEREFORE, to avoid prejudicing the Defense and to follow through on the obligations the Government voluntarily undertook in this action, the undersigned ORDERS the Government to continue to pay for the Database, through December 2014, providing the services agreed to by the parties in Terms and Conditions for Access to the [] Database.

**IT IS SO ORDERED**.

Dated: April 8, 2014

_____
NANDOR J. VADAS
United States Magistrate Judge

United States District Court
Northern District of California