MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

ADAM A. REEVES (NYBN 2363877)
ROBERT DAVID REES (CABN 229441)
Assistant United States Attorneys

   450 Golden Gate Avenue, Box 36055
   San Francisco, California 94102-3495
   Telephone: (415) 436-7200
   Fax: (415) 436-7234
   Adam.Reeves@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR 11-0664 JSW |
|    Plaintiff, | ) |
| | ) UNITED STATES' TRIAL BRIEF |
| v. | ) |
| | ) Date: January 12, 2015 |
| EBRAHIM SHABUDIN, | ) Time: 2:00 p.m. |
| | ) Court: Hon. Jeffrey S. White |
|    Defendant. | ) |

## I. INTRODUCTION

The United States hereby submits this Trial Brief on any controlling issues of law in compliance with the Court's standing order regarding Guidelines for Motions, Final Pretrial Conference, and Trial in Criminal Cases dated April 21, 2014 ("the Court's Standing Criminal Order") at 5 at ¶ 6(e).

## II. STATEMENT OF FACTS

### A. Overview

For all of 2008 and most of 2009, the defendant, Ebrahim Shabudin, was Executive Vice President and Chief Operating Officer of United Commercial Bank ("UCB" and the "bank"), a major Chinese-American commercial bank headquartered in San Francisco with branches throughout the

United States, Taiwan, Hong Kong, and China. From about September 2008 to about April 2009, Shabudin was also the bank's Chief Credit Officer with, as he put it, "ultimate responsibility" for the credit assessment of the bank's loans and calculating the bank's all-important Allowance for Loan Losses ("ALL"). *See* Trial Exhibit 1188 at 13 (PILLSBURY-007-00428). UCB was a wholly-owned subsidiary of UCBH Holdings, Inc. ("UCBH"). In 2008 and most of 2009, UCBH was a publicly-traded company whose securities were traded on the NASDAQ stock exchange.

As charged in the Superseding Indictment, Shabudin, and others, carried out a wide-ranging scheme to defraud UCBH's shareholders and federal regulators about the financial performance of the bank. Generally, the scheme to defraud at UCB ran in parallel with the plunge in real estate values that fueled the 2008 Financial Crisis because many of the bank's major loans were secured by real estate. The fraud led directly to the failure of the bank on November 6, 2009. At the time of its failure, UCB had approximately $11.2 billion in assets. According to the Federal Deposit Insurance Corporation ("FDIC"), UCB was the 20th largest bank failure in United States history. The government intends to prove at trial that UCB's failure has cost the FDIC and taxpayers approximately $1.1 billion. As such, UCB was one of the most costly bank failures as a result of fraud by bank officers ever.

### B. The Bank's Rapid Growth

The evidence will show that UCB's long-time Chief Executive Officer, Tommy Wu, grew the bank rapidly between 2002 and 2008 in an effort to be the first American commercial bank with a presence in mainland China. To do so, the bank was required by Chinese law to have at least $10 billion in assets. In order to grow quickly, UCB merged with, and purchased, a large number of other financial institutions based in the United States. Wu achieved his goal when the bank's assets exceeded $10 billion in the fourth quarter of 2006. This strategy of rapid growth came with increasing risk, however. By 2008, the bank's loan portfolio was heavily concentrated in construction loans and commercial real estate loans. These types of loans were more profitable, but more risky, than other types of business loans.

UNITED STATES' TRIAL BRIEF, *UNITED STATES V. SHABUDIN*, CASE NO. CR 11-0664 JSW

### C. Relevant Accounting Rules

#### 1. The Allowance for Loan Losses

As the bank's Chief Credit Officer during the third quarter of 2008 and fourth quarter of 2008 (year-end), Shabudin had primary responsibility for the credit assessment of the bank's loans. As part of that, Shabudin was responsible for the essential work of calculating, pursuant to accounting rule FAS 114, the "specific" reserve for the bank's poorest performing loans. In basic terms, UCB's loans were booked as assets on the bank's financial statements. UCB's internal controls required that the bank set aside reserves to cover anticipated loan losses. These reserves are listed on the balance sheet as the Allowance for Loan Losses or ALL. The ALL effects the bank's financial statements by decreasing its total assets. To increase the loan loss allowance, the bank must charge a cost on its income statement under the "provision" for loan losses. Thus, information tending to show a loan will not be collected in full can have a negative impact on both the balance sheet (by increasing the ALL and thereby lowering total assets) and income statement (by increasing the provision for loan losses and thereby lowering revenue).

#### 2. Risk Ratings

Shabudin concealed losses at UCB by, among other things, manipulating the bank's internal controls for properly "risk rating" loans. The bank's policies required that account officers and their supervisors, like Shabudin, assign numerical risk ratings to the loans in accordance with a numeric scale. Critically, each numeric risk rating had a corresponding loan loss reserve and, usually, the higher the numeric risk rating, the higher the resulting "loss factor" or reserve. For example, in the third quarter of 2008, a commercial loan required the following loss reserves for each numeric risk rating:

| Risk Rating | Description | Grade | Accrual (is interest being paid) | Accounting Treatment | Loss Factor (percentage of loan) |
|---|---|---|---|---|---|
| 1 to 7 | Outstanding to Marginal | Pass | Yes | FAS 5 | 1.50% |
| 8 | Special Mention | Criticized | Yes | FAS 5 | 6.50% |
| 9 | Substandard Accrual | Classified | Yes | If impaired FAS 114, otherwise FAS 5 | 15.00% |
| 10 | Substandard Non-Accrual | Classified | No | If impaired FAS 114, otherwise FAS 5 | 30.00% |
| 11 | Doubtful | Classified | No | If impaired FAS 114, otherwise FAS 5 | 50.00% |
| 12 | Loss | Classified | No | If impaired FAS 114, otherwise FAS 15 | 100.00% |

Summaries of the risk rating systems used by UCB in the third quarter of 2008, fourth quarter of 2008 (year-end) and first quarter 2009 are attached to the Government's Motion *in Limine* No. 1 at Trial Exhibits 1299, 1300 and 1301.

Generally, risk ratings from 1 to 7 were considered a "pass" and the loss factor or reserve was calculated as a percentage of the outstanding loan pursuant to accounting rule FAS 5. A risk rating of 8, however, was considered a "criticized" credit; its loss factor or reserve was still calculated as a percentage of the total outstanding loan pursuant to FAS 5 but typically at a much higher percent. Risk Ratings from 9 to 12 were usually considered "classified" and the bank needed to assess whether they were "impaired," in which case the bank was required, pursuant to accounting rule FAS 114, to estimate the value of the collateral securing the loan and calculate the loss factor or reserve as the difference between the outstanding loan balance and the value of the collateral. In this case, the defendant and others at the bank sometimes manipulated risk ratings for multi-million dollar loans to make "9s" (falsely) appear to be "8s" and "8s" (falsely) appear to be "7s" which – even though only one digit was being manipulated – had the effect of fraudulently concealing millions of dollars in losses.

UNITED STATES' TRIAL BRIEF, *UNITED STATES V. SHABUDIN*, CASE NO. CR 11-0664 JSW

4

### D. The Scheme to Defraud

The defendant's scheme to defraud concealed and delayed the recognition of loan loss reserves the bank was required to net against assets by approximately $205 million between the third quarter of 2008 and the third quarter of 2009. The aggregate amount of concealed losses over the period of the scheme is estimated in Trial Exhibits 1297 and 1297.1 (attached to the Government's Motion *in Limine* No. 1). To carry out the scheme, and make troubled loans falsely appear to be better than they were, Shabudin, and others, intentionally falsified bank documents, manipulated risk ratings assigned to criticized and classified loans, hid appraisals and note sales that revealed the true value of the collateral supporting the loans, prepared misleading documents for UCB's auditors and bank regulators and filed false and misleading financial statements with the SEC and the FDIC. At the center of this scheme to defraud was the defendant's falsification of the so-called ALL package -- a massive bank record the size of a telephone book -- that calculated the reserves required for the bank's loans. Shabudin fraudulently concealed negative information relating to the collectability of loans in order to avoid the increase in the ALL which would otherwise occur.

Much of the trial evidence will focus on the defendant's role in manipulating and falsifying the allowance for eleven (11) major, multi-million dollar, loans. Those borrowers, and their approximate loan amounts, are:

- Belvedere Homes LLC ($50.1 million in Q3 2008)
- International Norcent Technology ($44 million in Q3 2008)
- Nu Electronics, Inc. ($28 million in Q3 2008)
- Otay Ranch Twenty Two ($24.5 million in Q4 2008)
- Vallco International - Northwest Parcel ($14.5 million in Q4 2008)
- Harbor View ($10.7 million in Q4 2008)
- Pico Ranch – Sacramento ($12 million in Q4 2008)
- Cupertino Square LLC (Vallco) ($11.5 million in Q4 2008)
- Trade Winds Residences LLC ($11.7 million in Q4 2008)
- Vallco International - Mezzanine ($10.8 million in Q4 2008)
- Pico Ranch – Roseville ($8.1 million in Q4 2008)

UNITED STATES' TRIAL BRIEF, *UNITED STATES V. SHABUDIN*, CASE NO. CR 11-0664 JSW

5

*See* Trial Exhibits 1314-1324 (attached to the Government's Motion *in Limine* No. 1). Consistent with its Bill of Particulars (Document 158), the government will introduce evidence of fraud relating to loans for other borrowers including, but not limited to, 973 Market Associates LLC, Arlington 360 Associates and Burton 25 LLC. Finally, the government intends to prove the aggregated amount of fraudulently concealed losses using, among other business records, the ALL packages as reported and the ALL packages as restated (but never filed) by UCB in November 2009.

### E.     April 2009: The Scheme to Defraud Was Discovered

Between March 16, 2009 and March 31, 2009, the two week period between the filing of the SEC Form 10K and the close of the first quarter 2009, Shabudin and others endeavored to charge-off millions of dollars of loans including Norcent, Nu Electronics, Trade Winds, Harbor View and Pico Ranch. When it inquired about this as part of their first quarter 2009 review, KPMG learned that many of these charge-offs were based on appraisals and note sales that had been obtained before the filing of the March 16, 2009 SEC Form 10K and therefore should have been disclosed to KPMG in response to their multiple requests for this information. Soon thereafter, on or about April 6, 2009, Shabudin was removed from his position as Chief Credit Officer. On April 23, 2009, in its first quarter 2009 earnings release, the bank announced that it would add $46.1 million to its allowance. On May 15, 2009, KPMG sent a so-called "10A Letter" to the bank's audit committee stating that KPMG believed an inquiry into possible illegal conduct was warranted. On May 18, 2009, UCB announced that the March 16, 2009 SEC Form 10K 2008 financial statements and the April 23, 2009 first quarter 2009 earnings announcement were unreliable and would be restated.

### F.     May-October 2009: Internal Investigation

On May 18, 2009, UCB's audit committee retained the Pillsbury law firm and Deloitte LLP to conduct an internal investigation. Between May and October 2009, the investigative team gathered documents and interviewed key persons including Shabudin. On or about August 12, 2009, Shabudin

UNITED STATES' TRIAL BRIEF, *UNITED STATES V. SHABUDIN*, CASE NO. CR 11-0664 JSW

6

met with the internal investigation team and provided false and misleading information. On or about September 8, 2009, Shabudin was forced to resign from the bank.

### G. June-November 2009: Efforts to Sell and Plans to Close UCB

In June-October 2009, UCB relied on Sandler O'Neill to provide investment banking services to engineer a corporate transaction designed to recapitalize and save UCB, if possible. But the inability of UCB to file audited financial statements prevented UCB from working out a corporate merger or refinancing that would have prevented it from failing. On or about August 10, 2009, risk management supervisors at FDIC determined that UCB was undercapitalized and requested that FDIC's Division of Receivership (DRR) prepare a plan to possibly close UCB. Eventually, in October 2009, FDIC's DRR determined that UCB should be closed on November 6, 2009.

### H. November 2009: The Restated Financial Statements and UCB's Failure

On November 6, 2009, UCB filed its third quarter 2009 call report with the FDIC. On the same day, the FDIC closed UCB. The inability to file restated financial statements led directly to the failure of the bank on November 6, 2009. Even though the bank failed after he had resigned, Shabudin's deceptions within UCB and during the internal investigation contributed to the bank's inability to file restated financial statements. By concealing his fraudulent conduct to protect himself, Shabudin interfered with and delayed the bank's ability to file restated financials that accurately calculated the credit risk associated with its loans. In so doing, Shabudin helped doom the bank.

## III. ARGUMENT

Based on these facts, the controlling issues of law that the Court will need to resolve will primarily be the application of the Federal Rules of Evidence as they pertain to business records, admissions, and other rules of evidence. Each is discussed below.

UNITED STATES' TRIAL BRIEF, *UNITED STATES V. SHABUDIN*, CASE NO. CR 11-0664 JSW

### A. Rule 803(6) and Business Records

The government will offer a substantial number of exhibits in evidence pursuant to Fed. R. Evid. 803(6) as records of events made at or near in time during the course of regularly conducted business etc. These business records will include: (1) the bank's publicly-filed financial statements and call reports; (2) its complete allowance or ALL packages, with attachments; (3) widely-used core bank records summarizing loan details known as Risk Analysis and Action Plans ("RAAPS") and Credit Commitment Reports ("CCRs"); (4) memoranda used, for example, to authorize note sales or summarize loan conditions for the auditors; and (5) email, correspondence and other documents used to carry out the business of the bank.

### B. Rule 801(d)(2) and Admissions and Co-conspirator Statements

The government will offer a substantial number of exhibits in evidence pursuant to Fed. R. Evid. 801(d)(2) as admissions by an opposing party, the defendant, or statements made by the defendant's co-conspirator during and in furtherance of the conspiracy. While at UCB, the defendant authored or signed many emails and bank records that are admissible pursuant to Fed. R. Evid. 801(d)(2).

Shabudin also provided a detailed statement to Pillsbury and Deloitte during the internal investigation. *See* Trial Exhibit 1188 (with attachments). The government intends to offer selected portions of the defendant's statement to Pillsbury and Deloitte (but not the complete statement) pursuant to Fed. R. Evid. 801(d)(2). Alternatively, the government may offer selected portions of the *report* of the defendant's statement to Pillsbury and Deloitte as a recorded recollection pursuant to Fed. R. Evid. 803(5).

Finally, Shabudin's co-conspirators, Tommy Wu, Craig On, Thomas Yu, John Cinderery, Lawrence Zhang, and Lauren Tran, made statements during and in furtherance of the conspiracy that are admissible pursuant to Fed. R. Evid. 801(d)(2)(E). The government has complied with Criminal Local Rule 16-1(c)(4) because it has produced multiple FBI 302 reports, memoranda of interview, prior

UNITED STATES' TRIAL BRIEF, *UNITED STATES V. SHABUDIN*, CASE NO. CR 11-0664 JSW

witness testimony and other information about witness statements that summarize the statements by co-conspirators in sufficient detail for the Court to rule on their admissibility.

### C. Other Rules of Evidence

Depending on the basis on which other evidence is offered at trial, the Court may also need to rule on whether certain evidence is relevant pursuant to Fed. R. Evid. 401 and 402; hearsay pursuant to Fed. R. Evid. 802; a statement of the declarant's then-existing state of mind pursuant to Fed. R. Evid. 803(3); or a recorded recollection pursuant to Fed. R. Evid. 803(5).

Neither the government, nor the defendant, has given notice of an intention to call any expert witnesses. Although there will be extensive testimony about accounting for loans at a publicly-traded and federally-regulated bank, including testimony by auditors and bank regulators, the government does not consider this "expert testimony" within the meaning of Fed. R. Crim. P. 16(a)(1)(G) or Fed. R. Evid. 702, 703, or 705. Rather, these witnesses are percipient witnesses. *See generally*, *United States v. Anchrum*, 590 F.3d 795, 803 (9th Cir. 2009) (affirming conviction where district court clearly separated percipient testimony from expert testimony by a police officer).

### IV. CONCLUSION

Beyond the above-described and routine application of the Federal Rules of Evidence, the Government does not now anticipate other controlling issues of law that the Court will need to resolve in advance of trial.

DATED: December 29, 2014                    Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　MELINDA HAAG
　　　　　　　　　　　　　　　　　　　　　United States Attorney

　　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　ADAM A. REEVES
　　　　　　　　　　　　　　　　　　　　　ROBERT DAVID REES
　　　　　　　　　　　　　　　　　　　　　Assistant United States Attorneys

UNITED STATES' TRIAL BRIEF, *UNITED STATES V. SHABUDIN*, CASE NO. CR 11-0664 JSW